Filed 9/5/13  P. v. Campos CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FELIX MARTIN CAMPOS,<br><br>    Defendant and Appellant. | B245863<br><br>(Los Angeles County<br>Super. Ct. No. BA397664) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

    Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

    No appearance for Plaintiff and Respondent.

Defendant and appellant, Felix Martin Campos, appeals from the judgment entered following a jury trial which resulted in his conviction of leaving the scene of an accident which resulted in serious injury to a person other than himself (Veh. Code, § 20001, subd. (a)). The trial court sentenced Campos to three years in prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

    a. *The prosecution's case.*

At approximately 1:00 a.m. on May 13, 2012, Hung Ton was driving his nephew's car toward an intersection on Washington Boulevard. Ton did not yet have a driver's license[1] and his nephew, Cuong Ton (Cuong),[2] was in the car assisting him as he was becoming accustomed to "driving around [the streets of Los Angeles]." As Ton approached the intersection, the signal light turned green and he drove into it. "[S]uddenly," Ton's car was hit on the right hand side by another vehicle. Ton did not see the car coming and did not "have enough time to do anything." After his car was hit, Ton "passed out."

When Ton regained consciousness, he was still sitting in the driver's seat. He looked around and realized there were "a lot of people standing around the vehicle." His nephew, who was still in the seat next to him, was bleeding and when Ton called out to Cuong he did not respond. Cuong "did [not] move at all."

---

[1]     Ton apparently had a "learner's permit."

[2]     We refer to Cuong by his first name, not out of any disrespect, but for the sake of clarity.

2

Ton got out of the car and, as he was telephoning members of his family, saw a large white vehicle in the middle of the intersection. Ton did not see anyone inside the car and he had not seen anyone get out of the car. Police and an ambulance arrived and the individuals in the ambulance pulled Cuong from the car and transported him to a hospital. Ton, who was feeling pain in his right shoulder and the area across his chest where his seat belt had been, was also taken to a hospital in an ambulance.[3]

Cuong testified that on May 13, 2012 he owned a Volkswagen Jetta. During May of that year, Cuong had been "training [Ton] how to drive." Although Ton was having "no trouble at all," Cuong was "just making sure he knew" what he was doing. Cuong did not remember being in a car accident on May 13. The last thing he remembered before waking up in a hospital was "getting off [of] work" on May 12.

When Cuong regained consciousness, Ton told him about the car accident and a nurse told him he had been in the hospital for a month. Cuong remained in the hospital for approximately two more weeks and was then transferred to a facility where he received physical therapy. After three weeks in the physical therapy unit, Cuong was allowed to go home where he continued therapy on his own. At the time of trial, Cuong still had numerous scars from cuts received during the accident as well as incisions from various surgeries, including one on his face. The cuts and incisions still caused him pain. In addition, Cuong is now required to wear a brace in order to stand up straight and he

---

[3] Ton remained in the hospital for one day and two nights while doctors ran tests and "check[ed]" him out.

3

suffers from headaches he did not have before the collision. At the time of trial, Cuong still went for treatment approximately twice each month.

At approximately 1:15 a.m. on May 13, 2012, David Mack was riding his bicycle "in a westbound direction, on the north side of the street on Washington Boulevard, approaching Naomi Street." Mack was going to a 7-Eleven store to buy some cigarettes.

The signal light was red. "As [he] was approaching [the intersection, Mack] heard the revving of an engine [and] the squealing of tires, and it kept getting louder and louder and closer and closer. [Mack] could tell it was coming from southbound, heading in a northbound direction, toward Washington Boulevard on Naomi[.]" To Mack, the noises "sounded like a vehicle that was speeding, coming toward the intersection that [he] was about to cross." Mack noted that another vehicle, a silver Volkswagen Jetta, was stopped at the red light on Washington Boulevard. After the light turned green, the Jetta "started to come into the intersection." According to Mack, the Jetta "moved into the intersection relatively slow[ly]." Mack, on the other hand, had heard the sound of the vehicle on Naomi and had decided to remain stopped, even though the signal had changed. Mack "figured there was a car that was going to be blasting through that light." Mack then "witnessed a white S.U.V. . . . com[e] into the intersection [at between 40 and 50 miles per hour] and directly hit the Jetta, right in the side." Mack saw the "white S.U.V. [do] a 180, so it went from going northbound to facing southbound, across the north side of the railroad tracks" which run down the center of Washington Boulevard. "The Jetta was forced across the railroad tracks, into the oncoming lane of traffic, and ended up in a 90-degree position, in front of [Mack] . . . ." The Jetta stopped when it hit a bus stop bench.

4

At that point, the passenger side door of the Jetta was approximately 15 feet away and facing Mack. As the sport-utility vehicle (S.U.V.) had "done a 180," the vehicle was approximately 20 to 30 yards from Mack and the driver's side door was facing him. Approximately five seconds after the S.U.V. had come to a stop, Mack saw the driver's door open and Campos get out. After looking in Mack's direction then putting his hand up to his face as if to shield himself, Campos ran "in a northbound direction on Naomi." The area is "fairly well-lit" and Mack was able to get a good look at Campos's face. A few seconds later, a man in a green Charger entered the intersection. Mack, who believed the man was an undercover police officer, "sent him after [Campos]" while Mack called 911.[4]

Mack, who was on the phone with the 911 operator, walked over to the Jetta to see if the individuals inside were alright. The passenger, who was unconscious, was having convulsions and coughing up blood. The driver appeared stunned. Mack believed he, too, might have been unconscious for a moment. According to Mack, "[i]t took him just a little bit of time to get his senses back."

The first official to arrive on the scene was Los Angeles Police Officer Manuel Hernandez. Mack told the officer Campos had gotten out of his car and run north on Naomi and officers "went in that direction." In the meantime, Officer Hernandez told Mack to give a report of what he had seen to another officer, Los Angeles Police Officer Nam Phan. Mack gave to Phan a "rundown of everything [he had] seen" and told Phan

---

[4]     A recording of Mack's 911 call was played for the jury.

he could identify the driver of the S.U.V. if he were to see him again. Mack described the driver as a male Hispanic who was approximately 5 feet 5 inches to 5 feet 6 inches tall and weighed approximately 150 to 160 pounds. Mack indicated the man was wearing a blue and white checkered shirt and had short hair. After he finished giving his report to Officer Phan, Mack left the scene. He continued on to the 7-Eleven store, purchased some cigarettes then "headed back to where [he] was working."

Approximately one and one-half hours later, Mack was contacted by a police officer. The officer asked Mack if he could come to a Valero gas station at the corner of Central and Adams and identify a suspect. When Mack arrived at the corner, he was told to stand behind a patrol car and view an individual. Although Campos had changed his clothes, Mack had "[n]o doubt at all" he was the man who had gotten out of the driver's side door of the S.U.V. and run up the street. In making the identification, Mack recognized Campos's face.[5]

Jose Guevara was driving home from his job as a security guard at approximately 1:15 a.m. on May 13, 2012. He was in his green, 2005 Chrysler 300 and was wearing his uniform, which "sort of looks like a police uniform." Guevara had just gotten off the 10 Freeway and was turning on to Naomi Avenue when he saw someone running, heading northbound on Naomi. The person was wearing a "big black jacket [and] black pants." Guevara continued to drive and, approximately 45 seconds later, saw a vehicle

---

[5]  Mack admitted he had been convicted of possession of cocaine base for sale on May 23, 2011 and, at the time of trial, was on probation for the offense. He indicated, despite that fact, he had been "absolutely" truthful.

6

sitting on the railroad tracks in the middle of Washington Boulevard. At the intersection of Naomi and Washington, Guevara was approached by a man who told him to follow the guy who was running. Guevara put his car in reverse, backed up for approximately 25 feet, then saw a police car approaching. He decided to "[leave] it alone" and took no further action to pursue the man who had been running down Naomi.

Guevara drove back to Washington Boulevard and realized there was a gray car on the sidewalk. Guevara turned onto Washington to "see what was going on as to that car." He got out of his car, walked over to Cuong's silver Jetta and, as soon as the driver got out of the car, Guevara "[sat] him down on the sidewalk." Guevara stayed at the scene of the collision for a short time, then left.

Guevara was later contacted by police and asked if he had seen the "actual accident." Guevara told them he had not, but had seen "a guy running." Later that night, Guevara was again contacted by police. He was asked to go to the gas station at the intersection of Central and Adams "to identify somebody." Guevara believed the individual he had seen running up Naomi was approximately 5 feet 5 inches tall and weighed approximately 170 pounds. Guevara had not, however, seen the individual's face and was unable to identify the person being detained at the gas station. Guevara told one of the police officers the person he had seen running up the street had seemed "[b]igger and stockier."

Officer Hernandez had been with the department for approximately six years and, on May 13, 2012, was assigned to the Central Traffic Division. He had been working in that division for approximately two years and nine months. In addition to responding to

7

traffic accidents, Officer Hernandez performed " 'follow-up investigation[s]' " with regard to those accidents or collisions.

In the present case, Officer Hernandez, who was wearing his full uniform and driving a marked patrol car, received a radio call directing him to the intersection of Washington and Naomi. The call indicated there had been a "traffic collision" after which one of the drivers had fled. Hernandez explained that such a call is considered a "felony hit-and-run" and is dispatched through what is referred to as a " 'code three' " or " 'lights and sirens.' " Hernandez, the first officer to arrive at the scene, was designated the "investigating officer," which meant he had to determine whether a crime had been committed or whether the collision was simply the result of an accident. In addition, it was Hernandez's responsibility to find out whether either of the vehicles involved in the collision had been stolen.

Hernandez arrived at the scene of the collision within approximately three minutes of receiving the radio call. He first saw a white Chevrolet Tahoe with "major traffic damage to the front end" stopped on the train tracks in the center of Washington Boulevard. North of the Tahoe, stopped against a curb, was a "silver Jetta" with "major right side damage." Hernandez then saw "two L.A.P.D. trucks [which] belonged to . . . K-9 unit officers." The officers had heard the radio call and had responded to the scene to see if they could be of assistance. Hernandez asked one of the K-9 officers to " 'secure the scene.' " He then spoke with Mack and asked him if he had seen in what direction the driver of the S.U.V. had gone. Mack gave Hernandez a brief description of the driver, then told the officer the driver had run northbound on Naomi. While other

8

officers stayed at the scene to secure it, Officer Hernandez drove up Naomi "to see if [he] could find the driver." However, Hernandez was unable to find him and he returned to the site of the collision.

After speaking to one of the paramedics who had responded to the scene, Hernandez regarded the investigation as "more serious."[6] When Hernandez then heard a suspect had been detained, he asked two other traffic officers, Phan and Lu, to assist with the required paperwork by making a report. Hernandez, in the meantime, went to the S.U.V. to see if he "could locate anything belonging to a possible driver." Although Hernandez did not find the keys or a wallet, he found a cell phone on the driver's side floorboard. Hernandez also took note of the S.U.V.'s license plate number and obtained a Department of Motor Vehicles printout which showed the name of the registered owner as Sanchez Campos.

When he entered the S.U.V., Hernandez looked for signs indicating whether the vehicle had been stolen. Hernandez checked for a "punched ignition" or " 'hot-wiring' "

---

[6] After paramedics transported Cuong to the Los Angeles County U.S.C. Medical Center, he was first seen by Karl Andrew Marzec, a third-year emergency room resident. Cuong was found to be in "critical condition." Although he responded "to painful stimuli, [he was not] speaking coherently." He had injuries on his face and other areas of his body, including internal bleeding, as a result of "some sort of force, blunt or penetrating" trauma. It was unclear whether Cuong could breathe on his own, so he was intubated while still in the emergency room. Cuong's injuries were then designated as "severe" and he was transported to surgery within 15 minutes of his arrival at the hospital. During surgery, Cuong's spleen and one kidney were determined to be so badly injured it was necessary to remove them. He had also suffered a " 'grade four laceration' " to his liver, which had to be sutured closed. Throughout the procedure, Cuong received " 'massive' " blood transfusions.

but found evidence of neither. Once he determined the S.U.V. had most likely not been stolen, Hernandez went through the most recent messages on the cell phone he had found on the floorboard, then randomly began calling numbers. After making several calls which no one answered, Hernandez reached a woman. In Spanish, Hernandez told the woman he had found the phone in the area of Central and Washington and wanted $20 to return it. The woman hung up and Hernandez continued his investigation. However, approximately five minutes later, Hernandez received a call on the cell phone. A male voice told Hernandez someone had just made a call from the phone, the phone belonged to him and he wanted it back. The man then told Hernandez the phone "was very important to him [and] that he wanted it back or else he was going to call the cops and . . . activate the [phone's] G.P.S. tracking device . . . ." Hernandez told the man he would bring the cell phone to a gas station at the corner of Adams and Central. After reviewing several photographs on the phone which matched the description he had received of Campos, Hernandez proceeded to the designated gas station followed by Officers Lu and Phan.

Hernandez drove slowly down Adams Boulevard, followed by Phan and Lu. In his rear view mirror, Hernandez saw an individual run across the street toward Phan's and Lu's patrol car. Phan and Lu stopped and Lu then called Hernandez on his cell phone and told Hernandez the officers had been waived over by the man whose cell phone had been stolen. Because Hernandez believed the man speaking with Phan and Lu was Campos, Hernandez got out of his patrol car and approached the group.

10

Campos told Hernandez he had lost his cell phone when his car had been "carjacked." Campos indicated that approximately 15 minutes earlier,[7] he had gone into a liquor store at the intersection of 23rd Street and Central to buy some beer. However, when a "male Black approached him and started hassling him for money," he felt threatened and left the store without making a purchase. Campos had gotten back into his S.U.V. and started driving away when he was approached by two[8] "pisa-looking guys"[9] in a black Chevy with black rims. Although he was not forthcoming with regard to the details of the carjacking, Campos told the officer that one of the men had put a gun to his head and told him to get out of the car. Campos had immediately complied with the order, gotten out of the car and had run down Central Avenue. After his car had been taken, he had received a phone call from someone who stated they had his phone and would meet him at Adams and Central if he wanted it back. Campos indicated that at no time after the incident had he called 911.

During their four- to five-minute conversation, Campos appeared to be "agitated" and "upset." In addition, he did not seem to be overly concerned about what had happened to his car. He "just wanted his cell phone back . . . ." Based on his training and experience, Hernandez also noted Campos appeared to be under the influence. His

---

[7] Campos had previously told the officer he had gone to the liquor store between five and ten minutes earlier.

[8] Campos had originally told the officer he had been approached by four "male Hispanics," each of which had a shaved head.

[9] Hernandez testified "pisa-looking " guys are individuals who appear to have no gang ties or affiliations.

11

"speech was very slurred[,] [h]e had bloodshot, watery eyes" and he "smelled [of] alcohol" every time he spoke. At the time Hernandez met him, Campos was dressed in sweat pants and a top with a hoodie, both of which appeared to be too small for him, and he appeared to have been "freshly showered." Toward the end of their conversation, Campos stated he had called 911 after the carjacking. However, when Hernandez checked with the dispatcher, the individual indicated "[n]o radio calls [had been] generated." When Hernandez then contacted the Department of Motor Vehicles, he was informed that "there ha[d] never been a [driver's] license issued" for Felix Martin Campos.

Hernandez informed Campos there had been a traffic collision after which one of the drivers had fled and that the officer believed Campos was that driver. Hernandez then transported Campos to the intersection of Adams and Central, where Mack and Guevara were brought to view him. There, Mack "positively" identified Campos as the driver of the S.U.V. Guevara could not identify Campos.

After Mack identified Campos, Hernandez placed Campos under arrest for "felony hit-and-run" and read to him his *Miranda*[10] rights. Campos was then transported to the Central Jail, where Hernandez gave to him a number of field sobriety tests. Although the tests were not administered until approximately 3:30 that morning, based on Campos's inability to adequately perform them, Hernandez concluded Campos was "impaired" at the time. Hernandez then asked Campos if he wished to take breath and blood tests.

---

**10**    *Miranda v. Arizona* (1966) 384 U.S. 436.

12

Campos agreed to take both. The results of the breath test indicated that, at 4:20 a.m., Campos's blood alcohol level was .09. At 4:24 a.m., it was .08. Blood was drawn from Campos at 4:42 a.m. and indicated his blood alcohol level was .10.

Officer Phan has been assigned to the Central Traffic Division for approximately three years. He responds to calls regarding traffic collisions and accidents to assist at the scene if necessary and to then investigate the incident to determine how the collision occurred. In performing his duties, Phan wears a Los Angeles Police Department uniform and drives a marked patrol car.

At approximately 1:30 a.m. on May 13, 2012, Phan and his partner, Officer Lu, received a call over their radio indicating there had been a traffic collision at the intersection of Naomi Avenue and Washington Boulevard. The officers, who were under 10 minutes away from the intersection, immediately drove there. Phan indicated that, when the officers first arrived at the scene, "it was very crazy." There were "two cars with major damage." There were fluids leaking from under the front end of a white S.U.V. sitting in the middle of the intersection and there was "vehicle debris all over the place."

A small sedan, a silver Volkswagen Jetta, was "at rest . . . on the sidewalk, touching a [bus stop] bench." Fire Department personnel, including paramedics, had already arrived at the scene. In addition, another Central Traffic Division officer, Hernandez, was there.

Upon arriving at the intersection, Phan got out of his patrol car and approached Officer Hernandez. As Hernandez had been the first officer to arrive at the site, Phan

13

asked him how he could be of assistance. Hernandez told Phan to locate the drivers and any passengers and to check them "for injuries," to find out how many people had been involved in the incident and to determine if there had been any witnesses to the collision.

Phan determined there had been two men in the sedan, the driver and one passenger, both of whom had been injured. Phan was unable to speak with the passenger, who was on a gurney and being placed in an ambulance. The paramedics were apparently attempting to "get [him] to the hospital as soon as possible." As the driver of the Jetta was still "sitting inside the driver's seat," Phan was able to have a short conversation with him. However, when Phan then attempted to locate the driver of the S.U.V., he was unable to do so. Phan determined the driver was "missing" and he interviewed a witness, a Mr. Mack, in part "to get a description of the person who" had been driving the S.U.V.

Phan continued his investigation by taking photographs of the vehicles and the scene of the collision. He "also checked for possible witnesses who might have seen the collision" and could "identify who was driving which vehicle." Phan documented the "layout" of the scene as accurately as possible in an attempt "to make a determination as to . . . the physical set of events [which occurred] during the course of the traffic collision." He photographed both the interior and exterior of the vehicles involved and the "damages sustained." In addition, he took a photograph of the bench which had been hit by the Jetta. It "was detached from the base—from its original position, [from] where it was set originally. It . . . had some scrapes . . . which were from the contact with the silver Jetta." Phan also photographed

14

the "fresh and dark" tire marks in the intersection. Phan explained that both vehicles left "tire marks in the roadway . . . after the . . . impact."

While Phan was photographing the scene, his partner, Officer Lu, was preparing a diagram which, according to Phan, appeared to accurately depict "what the sequence of events [had been] in this particular traffic collision[.]"

Phan was at the scene of the collision for approximately one hour. During that time, both men who had been riding in the Jetta had been transported to the hospital in ambulances and both vehicles had been towed away.

Phan and Lu left the area, driving behind Officer Hernandez. However when they reached the "mid-block on Adams" near Central, a man "flagged [the officers] down." The man, who was later identified as Campos, approached Phan's window and began speaking to the officer in a "very fast" or "hyper" manner. Campos told Phan he had been carjacked and robbed approximately an hour earlier. He indicated "they [had taken] his car," a white S.U.V., in which he had left his cell phone and he intended to get his phone back. He wished to have the officer's assistance in doing this.

In the beginning of their conversation, Campos could not tell Phan exactly where the carjacking had occurred. He stated he had been at a liquor store attempting to buy beer "and eventually the Mexicans took his car." It was only later that Campos indicated he had been carjacked "somewhere between 23rd and Central." As Campos continued to speak to him, Phan noticed Campos was dressed in pajamas and appeared to be "drunk" or "impaired." Campos's speech was "slurr[ed] and rambling," he smelled strongly of

15

alcohol, his reactions were slow and he had "droopy" eyelids and "bloodshot, red, watery eyes."  Although he appeared "concerned," Campos also looked "nervous."

After he had spoken with Campos for approximately five minutes, Phan telephoned Officer Hernandez, who had stopped his vehicle and appeared to be waiting for Phan and Lu.  Phan told Hernandez how and why Campos had approached him.  Even after he called Hernandez, Campos continued to talk to Phan.  As the conversation progressed, Campos told the officer he had gone into a store and "a male Black [had] approached him and started to hassle him for money."  Campos had decided to leave the store and, as he was attempting to drive away, a car pulled up and blocked his path.  At that point, "some Mexicans . . . stole his truck."  Later, Campos received a call from someone who said they had his phone and wished to give it back to him.  Campos, who indicated he had earlier called the police, at that point wanted Officer  Phan "to go with him to . . . retrieve his phone."

By this time, Phan believed there was a connection between Campos and the collision which had taken place at Naomi Avenue and Washington Boulevard.  Phan suspected Campos was connected to the white S.U.V.

Hernandez, who had gotten out of his patrol car and walked back to where Phan and Lu were having their conversation with Campos, "took over the interview."  Phan and Lu then spoke with two women who had apparently accompanied Campos as he was headed to the designated site to retrieve his phone.  One of the women began to shout and yell at Phan.  After indicating she was Campos's girlfriend, the woman yelled out, " 'What are you doing?  He just got . . . carjacked.' "  At that point Phan decided to

16

telephone Mack, who had given Phan his cell phone number. Phan asked Mack if he could come to either the intersection of Naomi and Washington or Central and Adams for a "field show-up." Mack came to the intersection of Central and Adams where Phan admonished him, indicating the man he was about to view was only possibly the individual he had seen at the site of the collision. Phan told Mack "the purpose of the show-up [was] either to eliminate or identify the person as a suspect involved in the crime." After viewing Campos, Mack identified him as a person who had been involved in the collision.

Officer Lu had also spoken with a witness. That witness, Guevara, was also asked to view Campos at a field showup. Although they occurred at approximately the same time, the "two witnesses were separated when they were asked to [make their] identifications."

　　　　b. *Defense evidence*.

On May 12 and 13, 2012, 19-year-old Wendy Juarez was in a relationship with Campos. She and Campos had been living together in her mother's home near the intersection of Adams and Central and Campos is the father of her son. However, at the time of trial, Juarez and Campos were no longer involved in a relationship.

On the evening of May 12, 2012, Campos had been at home with Juarez, who was pregnant at the time, and Juarez's mother. Neither Campos nor Juarez had been drinking or using drugs that night.

At approximately 1:00 a.m. on May 13, 2012, Campos left the house. Juarez had asked him to go to the liquor store to get her a snack. When Campos returned to the

17

house a short time later, he was "agitated" and he told Juarez his car had been stolen. He seemed "really scared" and told Juarez to "call the cops" because, as he was leaving the liquor store, someone had stolen his truck at gunpoint. Juarez telephoned the police, but was told she could not report the stolen vehicle as she was not the owner of the truck.

Later that morning, Juarez received a telephone call from Campos's cell phone number. When she answered, a man told Juarez he had found Campos's phone at a taco stand and he wanted Campos to come and get it. Juarez then handed the phone to Campos, who spoke with the caller.

After he had finished speaking with the person on the phone, Campos, accompanied by Juarez, left the house. Campos "was trying to see if there was going to be a cop passing by." Campos did see a police officer driving down the street and he waived him down. After Campos spoke with the officer, he told Juarez that she could not come with him. At that point, Juarez believed the officers placed Campos under arrest. When Juarez asked one of the officers what was going on, he told her "that [Campos] was getting arrested, because he might be a suspect in a hit-and-run . . . ."

Campos testified he was 23 years old at the time of trial. He had testified in a court approximately one year earlier. Although on May 13, 2012, Campos lived with Juarez and her mother in a house near Central and Adams, at the time of the trial, he was living in Glendale. He was no longer involved with Juarez. He supports himself by doing odd construction jobs.

At midnight on May 12, 2012, Campos left the house to go to the local liquor store to buy some snacks for Juarez. The store is located on Central, by Washington. Campos

18

had not consumed any alcoholic beverages or drugs that night. When he left the house, he was wearing a blue sweatshirt and green sweatpants.

When he arrived at the store, Campos got out of his truck and was immediately approached by a "tall Black guy." The man repeatedly told Campos he needed money and followed Campos as he headed toward the store. Campos told the man to leave him alone, but the man persisted. Campos finally gave up and, without ever entering the store, got back into his truck, left the parking lot and turned left onto Central. As he was driving, looking for a place to make a U-turn, a black truck pulled in front of him, causing Campos to stop. The next thing Campos was aware of was a man opening the driver's side door to his truck. The man, who was holding a silver or gray gun at Campos's head pulled Campos from the truck, got in and, as the black truck pulled away, the man in Campos's truck drove after him. Campos, who had not had time to retrieve it, left his cellular phone on the console of his truck.

Campos walked the 20 or 30 minutes it took him to get home. The entire time he was "really scared." On his way, Campos stopped at a pay phone to try to call 911, but the phone was out of order. When he arrived at the house, he told Juarez what had happened and asked her to call the police. When the police dispatcher would not take the report from her because she was not the owner of the car, Campos did not speak to the dispatcher himself because he was too "nervous." Instead, he went to the refrigerator and had "two shots" of liquor. He had hoped the alcohol would help him calm down.

After awhile, Juarez received a call on her cell phone from Campos's phone. Juarez answered the call, then gave the phone to Campos. The man on the other end of

19

the line told Campos he had found his phone at a taco stand. When the man told Campos that he wanted to meet him at a certain location to give him his phone back, Campos told him he was going to "call the cops." Campos believed the person who had called Juarez's phone was one of the men who had carjacked him. Because he wanted a police officer to "take [him] to go meet [the man with his phone]," Campos decided to go outside and look for one. He saw an officer driving down the street and waived him down. When the officer stopped, Campos told him he "needed help." As he relayed his story to the officer, Campos was feeling really "nervous." He told the officer about the incident and that someone had attempted to carjack him on a previous occasion. The officer told Campos to " 'wait for somebody else[,] [t]hey will probably arrive. If [Campos] made a call, somebody [was] going to come.' " The officer then "just pulled off."

As Campos continued to walk, he saw a second "black and white." Campos approached the car and told the officer, " 'I just told the other guy that I just got carjacked, and he didn't help me.' " " 'The guy is calling me to go get my phone, and this is the guy that took my truck.' " After listening to Campos relate his version of the events of the evening, the second police officer, Officer Hernandez, told Campos he was going to be placed under arrest as his truck had been involved in a hit-and-run collision.

Campos, who had been talking to Officer Hernandez, felt the officer was not listening to him. Hernandez indicated Campos "was the guy, and he said, '[Y]eah, you hit-and-run, you hit people right now.' " Hernandez twisted Campos's arm back and Campos told the officer, " 'My arm is broken, can you please stop?' " Instead,

20

Hernandez arrested Campos and "put [him] in the car." Campos believed Hernandez was deliberately causing him pain.

c. *Rebuttal*.

Juarez testified that on May 12 and 13, 2012, she lived with her mother at 1158 East Adams Boulevard.

Officer Hernandez testified that, with regard to 911 calls, the operator will take the call and make a report even if the caller is not the victim of the crime. In addition, apart from whether the caller is the victim, an officer will be dispatched in response to the call. If an individual calls 911 regarding a carjacking, an officer will be dispatched immediately. Such a call is referred to a " 'code-three call' " and the responding officer will use his lights and siren to get to the scene as soon as possible.

When Hernandez first examined the S.U.V. at the scene of the collision, he noted the driver's seat was as far forward as possible. This indicated to Hernandez the driver was on the short side.

When Officer Hernandez spoke with Campos after he had waived down Officers Phan and Lu, the officer did not tell Campos he was the individual who had called Campos's girlfriend from Campos's cell phone. Neither did he tell Campos he believed Campos had been the driver in a hit-and-run accident. Hernandez allowed Campos to "go through the entire story of the carjacking, before [he] told [Campos] that [he] had information about the hit-and-run."

2. *Procedural history.*

Following a preliminary hearing, on July 25, 2012 an information was filed alleging in count 1 that, on May 13, 2012, Felix Martin Campos left the scene of an accident in violation of Vehicle Code section 20001, subdivision (a), a felony. It was further alleged Campos "unlawfully, and knowingly, being a driver of a vehicle involved in an accident resulting in permanent, serious injury to a person other than himself . . . , fail[ed], refuse[d], and neglect[ed] to give to the injured person and to a traffic and police officer at the scene of the accident his . . . name and address . . . [and] to render reasonable assistance to the injured person; and perform the duties specified in Vehicle Code sections 20003 and 20004."[11] After Campos was arraigned, he entered a plea of not guilty to the crime charged.

At the conclusion of the People's case-in-chief, Campos's counsel made a motion for the entry of a judgment of acquittal pursuant to Penal Code section 1118.1. The trial court denied the motion based on the state of the evidence, "including the testimony of Mr. Mack."

Following the evidence presented by the defendant and rebuttal evidence provided by the People, the People rested. All the exhibits were admitted, including the People's

---

[11] Vehicle Code section 20003 requires the driver of any vehicle involved in an accident resulting in injury or death to provide to any occupant of the other vehicle his or her name, address and vehicle information such as registration. The driver of a vehicle involved in such an accident is also required to render assistance to any person injured in the accident. Vehicle Code section 20004 requires anyone involved in an accident which results in death to anyone involved to comply with section 20003 and to, as soon as possible, report the accident to the California Highway Patrol or other law enforcement agency.

exhibit 22, the printouts showing Campos's blood alcohol levels which the trial court had allowed over defense counsel's objection. After hearing argument, the jury began deliberating at 4:18 p.m. on Friday, November 9, 2012.

On the morning of Tuesday, November 13, 2012, Juror No. 5 called the court and indicated she was sick and would be unable to come in. The trial court replaced her with one of the alternates then instructed the jury: "Members of the jury, I don't think you really started deliberations, because you went back there, only to go home, but, nevertheless, I need to read you one additional instruction at this point." The trial court then instructed the jury that it must "begin [its] deliberations again from the beginning." The jurors thus began their deliberations at 10:08 a.m.

Later that day, the jury sent a note to the trial court indicating it wished to have a readback of testimony regarding the "timeframe" of events. According to the trial court, it seemed the jury wished to have read back the testimony of Phan, Hernandez and Campos. The court continued, "As read, arguably, it asked for readback of the entire trial. So, Miss Jones[,] [the court reporter,] went back and asked them, 'Can you be any more specific? Write on the form what you want.' " The jury then sent a note requesting readback of "Mr. Campos['s] testimony on cross, where he gave a physical description of the carjacker." After the trial court consulted with counsel and Campos regarding whether any of them wished to be present for such readbacks, it was agreed the court reporter could simply go into the jury room and read to the jurors the requested testimony.

23

On the morning of November 14, 2012, the foreperson indicated the jury had reached a verdict. After the verdict form had been reviewed by the trial court, the court clerk read the form into the record. It indicated, in relevant part: "We, the jury in [this] . . . action, find the defendant, Felix Martin Campos, guilty of the crime of leaving the scene of the accident resulting in injury, in violation of Vehicle Code section 20001, sub[division] (a), a felony, as charged in count 1 of the information. [¶] We further find the allegation that the injury was permanent and serious to be true." The jury was then polled and each juror indicated that this was their verdict. After the jury was excused, sentencing was set for November 30, 2012 and Campos was remanded to the custody of the sheriff.

On December 18, 2012, after hearing argument by the parties, the trial court concluded there was one aggravating factor, that Campos had "interfere[d] with the judicial process [by committing perjury], and [one] mitigating factor," that he had no prior record. Under the circumstances, the trial court determined the mid-term of three years in state prison was the appropriate sentence in this case. The trial court awarded Campos presentence custody credit for 46 days actually served and 46 days of good time/work time, or 92 days. The court then ordered Campos to pay a $240 restitution fine (Pen. Code, § 1202.4, subd. (b)), a stayed $240 parole revocation restitution fine (Pen. Code, § 1202.45), a $40 court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)), a $30 criminal conviction assessment (Gov. Code, § 70373) and restitution to the victims pursuant to Penal Code section 1202.4, subdivision (f), the amount of which was to be determined after a hearing was held on the matter.

Campos filed a timely notice of appeal on December 18, 2012.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.

By notice filed June 14, 2013, the clerk of this court advised Campos to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response had been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CROSKEY, J.


We concur:


KLEIN, P. J.                        KITCHING, J.

25